This is United States v. Coleman, Case 23-2760. Mr. Luthan, it's always a pleasure to see you whenever you're ready. Thank you, and may it please the Court, Elliot Luthan on behalf of Mr. Clifton Coleman. This case requires us to change gears and shift from the pretrial phase to the sentencing phase. There are two issues on appeal. One, a Brady claim related to the leadership enhancement, and secondly, the stash house enhancement. Starting with the Brady claim, to level set, there are three elements, favorable, suppressed, and material. Only the latter two are contested here, so to begin with suppression, the government's argument is a wolf in sheep's clothing. The government would have this Court shift Brady obligations onto defense counsel, and thankfully this Court doesn't need to look any further than the Supreme Court's decision in Kiles, which says that where the government, that Brady reaches situations where the government failed to volunteer exculpatory evidence, never requested, or requested only in a general way. And that clear statement of Brady doctrine rejects the government's contention that where defense counsel is well aware of evidence, but declines to request or review it, the government has not suppressed evidence. I don't think the Court needs to examine that in any further depth than that, and the closer question really is the materiality element, as it often is in Brady cases. And here what's unusual, or atypical, is the equivocation that Judge Bowen expressed. We see inoculating statements all the time, even more so than this Court sees, because oftentimes we have to advise clients that they need to dismiss their appeal, refile an Anders brief, right, because of inoculating statements. That's how common they are. This sort of equivocation is uncommon. It's not the norm. And it's why this Court should send the case back just for a limited evidentiary hearing to determine whether these interview recordings would have made a difference. And in the briefing I use a statistical spectrum because I really think it helps illustrate how these interview recordings could make a difference. We know from evidence that a preponderance burden is 50 percent plus one. Based on what Judge Bowen said, that I'm torn. I think this is a very, very close call. I think this is a very, very close case. The government is saying it has overwhelming evidence, but I don't find that. Maybe she's at 51 or 52 percent, right? And I'm not here submitting that these interview recordings would move the needle from 90 percent down to 49. But if they're just a few percentage points, right, if they contain information about other alternative supplier sources, that very well could be the difference between this leadership enhancement applying and it not. And for Mr. Coleman— Your request for an evidentiary hearing, would we need that if we have the summaries? No. And the answer why is that they're not – the recordings themselves are no substitute for – excuse me, the summaries are no substitute for the recordings. In the same vein, if the government had access to body cam footage, we wouldn't accept a law enforcement-authored summary of what happened in lieu of that body cam footage. There's key context, the questions that were asked, the demeanor, things that a lawyer could glean, or even the defendant himself in reviewing that might pick up on and say, wait a second. You should look into that more. And based on our adversarial system, that's the province of defense counsel. So that's why we think that the summaries are not a substitute and not merely cumulative. Did the government counsel kind of inoculate itself against that argument by accepting the defense position as to what the video could have shown, as to direct quotes, context, all that stuff? The government below accepted it to a degree, but a proffer is no substitute for the recordings themselves. If you or I were representing Mr. Coleman below, the government didn't say, oh, here's exactly what was said or the questions that were asked, nor did they get into the alternative supplier sourcing, which I think really is what would move the needle more than anything else from my vantage point as the appellate lawyer without full access to the record. But aren't you – so regarding this alternate supplier, I think Jackson, right? Yes. Is his name. But the court understood and knew that at times that Mr. Watson and other people were sourcing their drugs from an alternate supplier. And so are you just speculating that there's going to be additional information on the videos that would kind of bolster that proposition? I'm trying to figure out what material information might be on the tapes that you don't have in the summaries that the court didn't know about. Well, one, the court only knew about Jackson at this high service level. We don't know the extent to which how much the street operation was purchasing from him. There was a proffer that – excuse me, Jackson is this middleman. What does that entail? Were there other folks besides Jackson, other suppliers besides Jackson? Given the amount of weight that we have at issue here, that is not a far-fetched speculation to imagine that a street operation might have gone to other suppliers as well. I mean, just from a law enforcement interview standpoint, those are textbook questions they're going to be asking. And the co-conspirator's answers, an unequivocal no, we didn't go to anyone else, or silence, or hesitancy, those are subtle nuances that very much could come into play. And so no, I don't think Judge Rowland had the full picture. Most importantly, Coleman's trial lawyer was not armed or equipped with the full picture as to what occurred in those – or what was said in those interview recordings. To dovetail with that, I think it's also important to take a step back that here the government on appeal has not contested favorability. They're telling this court, you assume that it's favorable. And they leave it at that level of generic generality from my vantage point because they don't want to go into any more of those details. And so there's something here to be explored. And so that's why recognizing that this claim wasn't raised below, the requested relief is a middle ground. We're not asking this court to overrule the enhancement. Judge Rowland was close to this case. I mean, her ruling was thorough. She did a great job. But given the equivocation she expressed, I think it would be the most prudent course of action for her to consider these interview recordings below, and then we can all be confident that the leadership enhancement should apply or should not apply. Didn't the government, I thought I read somewhere, offer to provide the information to the judge? And the judge said, you know, I'm not worried about it. My reading of the transcript is that at the sentencing hearing, the government offered to provide the summaries and not the recordings. You're into your rebuttal time. Would you like to reserve it? Yes. Thank you. Mr. Peabody? Good afternoon, Your Honor. May it please the Court, Tom Peabody for the United States. There was no plain error in the disclosure of the underlying videos of the co-defendant interviews for both suppression and materiality reasons. I want to start with suppression. And let me start by saying what the government's position isn't in this case. It is not that these were best practices, and it is not that the government's initial position below regarding the discoverability of the reports was correct. It is, however, that as this case comes to this Court, with the reports having been produced two months before the sentencing, with the facts of the videos being written writ large across the record, referenced by the defense himself, and yet somehow never requested, even though the government offered to give the Court the statements, and Judge Lee, you asked about that issue. It's in the appendix at page 60. What the prosecutor said below was it was an offer to give the quote-unquote statements. It's not clear whether it was a reference simply to the 302s or the videos themselves. Given that the discussion had been up to that point, the 302s themselves, I understand the defense's position on that, but the quote was a reference to give the Court the statements. The government is not putting the Brady burden on the defendant. The defense is absolutely right about the general rule. The government has an affirmative obligation to disclose Brady material. That rule has a caveat, like a lot of general rules, and it's one that this Court and many others have recognized. The government does not suppress evidence when reasonable diligence, or here, a desire with reasonable diligence, or here, a desire to access the materials. There is no suppression. This Court recognized it in Thomas. The Eighth Circuit recognized it . . . Was there an offer made to the district judge to view the videos? Judge, I think functionally there was. What does that mean? Sometimes what happens is prosecutors give over an index and say, you can review anything you want to see here. That was not the case here. I believe that was for profound safety concerns about co-defendants who had chosen to speak. But as I was discussing with Judge Lee, at page 60 of the appendix, the prosecutor says, if the Court thinks they'd be helpful, I can give you the statements. And at that point, I appreciate that the statements themselves are not in the record, but in bold print in those statements is, there is a recording that comes with this. The problem is the defense didn't want to see the recording. It asked only for the statements. And I would direct the Court's attention to page 5 . . . So, directing you back to my question, were the videos offered to the judge? Not explicitly. The statements were more generally. But we are on plain-air review, and I would direct the Court's attention to page 5 of the reply brief, in which the defendant, in trying to grapple with this Court's and other Courts' reasonable diligence law, suggests that the Court should reconcile and clarify that reasonable diligence means only access to already public information. If this Court needs to reconcile and clarify law, there was no plain error. There was no obvious error. Full stop. And I want to say a word about Kyle's, because I think the defense's reliance on it is well misplaced. Kyle's is a materiality case. It is not a case about suppression. The quote on page 433 of that opinion that the defense relies so heavily on is referring to Augers. Augers was explaining three situations in which the Supreme Court had recognized Brady claims. When a prosecutor knows about perjury, when there's a specific request made, or third, when there is no request or a general request made. If you refer back to Augers, pull the thread here a little bit, that description, the paragraph starts as follows. In many cases, exculpatory information in the possession of the prosecutor may be unknown to defense counsel. This is not a novel theory that the government is putting forward about Brady. Brady has, it is a strenuous obligation sometimes. It is a sacrosanct one, but it is not oblivious to the realities of litigation. When, as here, the defense is well aware of evidence and literally has summaries of what that evidence shows, recognizing this court certainly on plain air should recognize again that it is not suppressed. Let me turn to materiality unless there are additional questions on suppression. The defendant made full use of the summaries at trial with no objection from the government and nevertheless the district court decided that they didn't merit putting on the scale. The defense uses certain analogies in its brief about tilting a scale or statistical analysis. I think those are misplaced because the district judge, after hearing from defense counsel, spent four or five transcript pages on these 302s and after the defense had an opportunity to brief the 302s in his sentencing memo, didn't talk about it in deciding whether or not the leadership enhancement applied. Mr. Pippa, could I direct you to the Stash House? Sure. As I understand it, Mr. Coleman was the landlord and he owned the apartment. Mr. Watson was renting the apartment and Mr. Watson, as far as I could tell from the record, was paying Mr. Coleman the rent he was paying was market rate because he was paying the same rent as the neighbor upstairs who has no part in the conspiracy. Is there any evidence that Mr. Coleman had full access to the apartment? In other words, that he had keys or he can go whenever he wanted? I know that he went there four times to drop off drugs and to collect money, but I'm wondering whether there's any evidence with regard to what degree Mr. Coleman controlled access to the apartment. No, Judge, I don't believe there's record evidence that he had keys or that like in the Kraft case, he could let himself in and out whenever he would like. Is there any evidence that Mr. Coleman was the one that directed Mr. Watson to rent the apartment? No, Judge, I don't believe there is. The reason why I'm concerned about that is the district court seems to rely heavily on this notion of a possessory interest. But a landlord doesn't really have a possessory interest or to the extent a landlord does, only has limited one because the lease transfers the possessory interest to the tenant. And so I'm wondering, technically there's a possessory interest, but it's only in certain limited instances. And I'm wondering what other evidence there is of Mr. Coleman's possessory interest other than his interest as a landlord in and of itself. Judge, as to that one factor, possessory interest, I don't think there is other evidence. I view it as pretty darn compelling. I mean, having rented in the city, I think my former landlords would be surprised if there were a court ruling that they didn't have a possessory interest. They'd not be able to access it freely, but they still owned the thing. And here, Mr. Coleman owned the stash house. But the question is really kind of control, right? I mean, possessory interest is supposed to be indicative of control. And so part of control is access. And so I'm wondering if you could tell me what the record says about Mr. Coleman's access to the apartment. So we know, for one, and the defense conceded this below, that unlike in Kraft in Montgomery, this is an out-and-out stash house. Mr. Watson does not live there. There was some allegation that maybe he had a girlfriend over there. But this is just a straight-up stash house for the receipt coming from Mr. Coleman, the manufacturer with the Rouseys and Watson, and ultimately the distribution of drugs. In addition, I think I'd be remiss not to point out, Judge Lee, that Mr. Coleman was the leader of this organization. He owned the apartment. He rented it to a co-conspirator. And he knew, as he conceded below, exactly what that apartment was being used for, a stash house. But I think we've said that knowledge alone isn't enough, right? There has to be some control. And so are you leaning upon the fact that he was determined to have a leadership role in the general organization to establish control over the stash house? No, Judge. It's not simply that he was a leader. He used it for that purpose. I think the district court pointed out that there were at least four drop-offs of the supply for the group. He knew that his co-conspirators would then be manufacturing the drugs there for the distribution. He came there to pick up the cash. I mean, yes, he is the leader. He's also a core member of the conspiracy, as he depicted below, the supplier. And he's using an apartment he literally owns and has rented to a co-conspirator for the receipt, production, and sale of narcotics. I mean, I understand all that. It just strikes me as strange that the rent is at market rates and that there isn't any evidence that Mr. Coleman was forcing Mr. Watson to use it. I mean, one would presume that if Mr. Coleman was really using it, that he would either not charge rent or that rent would be different from what he would charge the market. I appreciate the point, Judge. I think that he may have gotten one over on his inferior in the DTO. I don't find it deeply probative, given sort of the facts as I've described them. I see my time is up. Unless there are any further questions, I would ask that the government affirm the court sentence. Thank you, Mr. Peabody. Judge Lowden, you have about two minutes for rebuttal. Thank you, Judge Lee. I'm going to try to make a point on each of the issues. On the Brady issue and this notion of the reasonable diligence doctrinal idea, I would direct the court's attention to the first footnote in the reply brief, which gets and examines how that language came to be. And it predates Kyle's and it cannot be reconciled with Kyle's. Moreover, since then, this court has been clear. Really, this panel doesn't need to look any further than Bicknell, which also concerns sentencing. In terms of how affirmative the obligation is. Turning to the Stash House issue, the government still has not addressed why they could not have prosecuted Mr. Coleman under 21 U.S.C. 856, which is the Stash House criminal offense. And to the point of the text in the guideline, there is a difference, a textual difference between maintaining and managing. The guideline could be written in a similar vein to the federal statute, where it applies when the defendant maintains or manages a premises, et cetera. But it just uses the word maintain. And later on in the guidelines in 2D1.8, the Sentencing Commission distinguishes between maintaining and managing, which implies that each of those verbs have independent meaning. And this court draws on those background principles in interpreting the text of the guideline. Finally, Judge Lee, your questions about rent and the government's response that, well, surely it's a Stash House. This very much rings in a similar vein to the arguments that were made in Montgomery and Kraft, which is, yeah, this is close enough. But they had the obligation of building the record, and they didn't do so. And ultimately, the district court made two findings, neither of which was sufficient on the maintained element and the primary purpose element. If the court has no further questions, we'd ask for a reversal on the Stash House enhancement and a remand for the evidentiary hearing. Thank you. Thank you. Thank you, counsel.